FILED
United States Court of Appeals
Tenth Circuit

September 18, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KIMBERLY AUBREY,

    Plaintiff - Appellant,

v.

CARLY KOPPES, as Weld County Clerk
and Recorder; WELD COUNTY BOARD
OF COUNTY COMMISSIONERS,

    Defendants - Appellees.

No. 19-1153

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:17-CV-01501-RM-SKC)**
_____

Jennifer Robinson, Robinson and Associates Law Office, LLC, Denver, Colorado, for
Plaintiff-Appellant.

Alan Epstein (Mark S. Ratner and Kendra K. Smith, with him on the brief), Hall &
Evans, L.L.C., Denver, Colorado for Defendants-Appellees.
_____

Before **CARSON**, **BALDOCK**, and **EBEL**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

Plaintiff Kimberly Aubrey was, by all accounts, an exemplary employee for the Weld County, Colorado, Clerk and Recorder's office. She became unable to work for a time due to posterior reversible encephalopathy syndrome ("PRES"), a rare condition characterized by fluctuating blood pressure that causes swelling in the brain, coma and sometimes death. Eventually Aubrey's PRES resolved and she began to recover. The County allowed her to take several months off but eventually terminated her employment. By that time, Aubrey contends, she had recovered sufficiently to be able to return to her job, with reasonable accommodation for her disability. Aubrey sued the County under the Americans with Disabilities Act ("ADA"), and several related statutes. The district court granted the County summary judgment on all claims. Having jurisdiction under 28 U.S.C. § 1291, we REVERSE in part. Aubrey presented sufficient evidence that a jury could find that the County failed to engage in the collaborative interactive process that the ADA calls for between an employer and an employee in order to determine whether there is a reasonable accommodation that would have permitted Aubrey to perform the essential functions of her job. In light of that evidence, Aubrey's failure-to-accommodate and disability discrimination claims were sufficient to survive summary judgment. We, therefore, REVERSE summary judgment for the County on those claims and REMAND them to the district court for a trial. But we AFFIRM summary judgment for the County on Aubrey's retaliation claims because she failed to present sufficient evidence for a reasonable jury to find that the County terminated her employment in retaliation for her asking for an accommodation.

2

# I. BACKGROUND

We view the evidence in the light most favorable to Aubrey and draw all reasonable inferences from those facts in her favor. See Doe v. Univ. of Denver, 952 F.3d 1182, 1189 (10th Cir. 2020). The Clerk and Recorder's office has three divisions: motor vehicles, recordings, and elections. The motor vehicles division, in particular, is fast-paced and involves high stress because of the number of customers that division sees daily.

In June 2012, Weld County hired Aubrey for an Office Tech II position in the motor vehicles division and six months later promoted her to Office Tech III. Aubrey later applied and was selected for a position in the recordings department, where her duties included examining and analyzing legal documents for land record recordings, assessing and collecting fees, issuing marriage licenses and civil union certificates, and assisting the public over the telephone and computer and in writing. Aubrey was then temporarily assigned to the elections division for almost a year. Her work performance in these various positions was, by all accounts, exemplary.

As Aubrey was completing her temporary assignment in the elections division, she became unable to work in December 2014 because of PRES. Aubrey suffered severe tremors, seizures, and fell into a coma. Her functional capacity became severely limited. As her condition worsened, Aubrey was hospitalized for two weeks, beginning January 10, 2015, and then she was transferred to a long-term rehabilitation hospital where she stayed from January 29 until mid-February 2015.

3

Eventually her PRES resolved and Aubrey began to recover. She underwent speech and occupational therapy, and continued to see several doctors.

During January, February and early March 2015, several of Aubrey's doctors indicated that she would not be able to return to work for approximately six months, until July 31 or August 1, 2015. One doctor explained that, in January 2015, she estimated that Aubrey would be able to return to work by August 1 because "most people get better in six months." (Aplt. App. 275.) But as the spring progressed, Aubrey recovered faster than expected.

When Aubrey first became unable to work, in December 2014, she applied for leave under the Family Medical Leave Act ("FMLA"), which was approved by the County's third-party administrator, FMLASource. Aubrey was notified that, in order to return to work, she had to have a physician certify that she was fit for duty. Aubrey exhausted her twelve weeks of FMLA leave by February 22, 2015. But the County continued to hold her position open for her without pay for several more months while placing another employee into that position temporarily. County policy permitted up to six months total leave (paid and unpaid combined). In addition, Aubrey's supervisor, Clerk and Recorder Carly Koppes, had discretion to authorize additional leave. Koppes exercised her discretion to extend Aubrey's leave indefinitely.

As requested, Aubrey kept the County's administrator, FMLASource, informed about her condition. She also contacted Jewell Vaughn in the County's Human Resources Department on February 17, 2015, telling Vaughn that she had

4

been released from the rehabilitation hospital the previous week. Although Vaughn forgot to ask Aubrey to update her work status, Vaughn reported to Human Resources Director Patricia Russell that Aubrey said it would be "months" before she could return to work as she was having memory problems and could not see very well, but that her condition was reversible.

The next time Aubrey heard from the County was on April 15, 2015, when Deputy Clerk and Recorder Rodolfo Santos hand delivered a notice to Aubrey informing her that she had to attend a pre-termination hearing the next morning at 10:30 a.m. The notice was signed by Clerk and Recorder Koppes and stated that the County had scheduled the pre-termination notice because it could not accommodate Aubrey's restrictions from her medical problems. At her deposition, however, Koppes testified that this was a standard form letter drafted by the County Human Resources Department and that Koppes, in fact, did not have any information about Aubrey's medical problems or how long they might last.

The April 15 letter informed Aubrey that

[d]uring this hearing, you have the right to present any updated information regarding your medical condition as it relates to your ability to perform the essential functions of the Office Technician position. If you have any medical updates from your doctor, please bring that information with you to the scheduled hearing. This hearing is your opportunity to present any relevant information which would have bearing on your employment status.

(Id. at 244.) With less than twenty-four hours' notice, however, Aubrey was unable to obtain any updated medical information from her doctors.

5

The April 16 pre-termination meeting between Koppes, Human Resources Director Russell, and Aubrey was transcribed. A reasonable jury could find from the overall tenor of that meeting that the County officials were not interested in gaining information about Aubrey's limitations and exploring whether she could return to her job, but instead had already decided to terminate her employment.

The meeting started with Russell and Koppes explaining that "it has nothing to do with [Aubrey's] job performance." (Id. at 246.) Aubrey asked if this meant that she was "automatically dismissed." (Id. at 247.) Russell explained that this was Aubrey's "opportunity to tell us why we shouldn't dismiss you," and then asked Aubrey if she "could []come back to work within the next couple weeks . . . to do your full position." (Id.) Aubrey answered: "Actually, if you ask me to, I could come back next week. But I would not be able to do the things you asked me to. I mean, I could not go to Motor" vehicles, the most stressful of the three Clerk and Recorder divisions. (Id.) "I would probably have to be somewhat retrained. I am finally remembering some of the things I did in election." (Id.) Aubrey further explained that she was "still going to therapy" and had "worked very hard to be where I am. I just don't feel confident yet that I could do what I was. With a little bit of prompting and things like that, yes." (Id. at 248.)

She stated that she could not drive yet but "I am able to do my own insurance stuff now. I can write my own checks. I type. It's hard because of my vision, but it's all getting better. And I'm very thankful for that, because I could be dead, and I'm up and walking." (Id. at 249.) She also stated that she had typed something "for

6

long-term disability. . . . So if there's errors. It took me forever, but that was a couple of weeks ago. I'm working hard on the computer." (Id. at 258.) Aubrey indicated that her recovery was going better than her health care providers had expected; "I was supposed to be [in the rehabilitation hospital] the minimum six weeks. I was out in two." (Id. at 250.)

Aubrey also asked for some additional time to gather her medical information and explained that no one had previously notified her that she needed a return-to-work certification from her doctor at that time. Aubrey could not get in to see a neurologist until May 22, 2015, and a neuro ophthalmologist "on the 30th."[1] (Id. at 248.)

Human Resources Director Russell responded by informing Aubrey that her FMLA leave had expired; if Koppes decided she could no longer hold a position open for Aubrey and another job opened up later in the Clerk and Recorder's office, "I'm pretty sure that [Koppes] would so totally consider you" and, if Aubrey applied for some other County job, the Clerk and Recorder's office would give her a "very good reference." (Id. at 252.) Aubrey expressed her fear that no one would hire her after her medical problems, fearing her PRES might recur, even though that was very unlikely. Russell assured Aubrey that the Clerk and Recorder's office would not "hold that against you." (Id.)

---

[1] Although Aubrey did not specify in the meeting, this appointment was apparently on April 30, 2015.

Aware there was an open Office Tech II position in elections, Aubrey then offered to take a demotion to an Office Tech II position, and she also asked for "some time to get all my doctors in order and say I can come back." (Id. at 253.) Koppes and Russell did not respond to these requests, except to offer Aubrey a Kleenex because she was crying. Ordinarily, the County gives employees seeking an accommodation for a disability a County form to be completed by their doctor, and employees are given fifteen days, sometimes longer, to obtain that information from their physician. Aubrey was not given this form until after she was terminated. In her deposition, Human Resources Director Russell testified that Aubrey was not qualified for any position at the time of the hearing because she had not produced a fitness-for-duty certification from her doctor. But Aubrey was not notified before the pre-termination meeting that she needed to bring a fitness-for-duty certification, nor was she given any time after the meeting to try to obtain that certification.

Several days after the April 16, 2015, pre-termination meeting, and without giving Aubrey any more time to gather information from her doctors about her remaining limitations and when she could return to work, Koppes terminated Aubrey's employment, effective April 20, 2015. The termination letter inaccurately indicated that Aubrey had stated during the April 16 meeting that she was unable to return to work until July 31, 2015. Aubrey never said that. Further, both Koppes and her deputy testified in their depositions that the County could not accommodate Aubrey's inability to see. But according to Aubrey, while she had some vision problems at the time of the hearing, she had no restrictions regarding her sight.

8

Koppes further testified that the County could not accommodate Aubrey's inability to use the computer or telephones. But Aubrey stated during the pre-termination meeting that she had been using a computer and working to improve her computer skills. She never indicated that she could not use a telephone.

At her May 22 appointment, Aubrey's neurologist indicated that her PRES had resolved as long as her blood pressure remained controlled. On June 4, the neurologist cleared Aubrey to return to work. The employee who had been assigned temporarily to Aubrey's position was not transferred permanently to that position until June 19, 2015. Thirty days later, that employee vacated the job and transferred to another position.

In the April 2015 termination letter, the County encouraged Aubrey to apply for short- or long-term disability benefits. Aubrey did so, applying for long-term disability benefits the day the County terminated her employment, on April 20, 2015. Aubrey eventually received first short- and then long-term disability payments through July 31, 2015. Her long-term disability benefits were based on the insurer's determination that Aubrey could not perform the substantial and material duties of her occupation, without taking into account "any tasks, functions, skills or responsibilities that could be reasonably modified or omitted." (Id. at 325.) Aubrey's disability insurer also requested that she apply for Social Security disability benefits. When she did, Social Security denied her claim because she was not disabled from doing her past work as a waitress.

9

After obtaining a right-to-sue letter, Aubrey sued Koppes, the Weld County

Clerk and Recorder, in her official capacity, and the Weld County Board of County

Commissioners (collectively the "County") under the Americans with Disabilities

Act ("ADA"), 42 U.S.C. §§ 12101-12213, as amended by the ADA Amendments Act

of 2008 ("ADAAA").[2]  Aubrey asserted three ADA claims, alleging the County

1) failed to accommodate Aubrey's disability, 2) discriminated against Aubrey

because she was disabled, and 3) fired her in retaliation for asking for an

accommodation for her disability.  Aubrey also asserted the same claims under the

Rehabilitation Act, 29 U.S.C. §§ 701-796*l*, and Colorado's Anti-Discrimination Act

("CADA"), §§ 24-34-401 through 23-34-406.  The district court granted the County

summary judgment on all claims.[3]

## II. STANDARD OF REVIEW

We review the district court's summary judgment decision de novo.  See

Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co., 960 F.3d 1255, 1259

(10th Cir. 2020).  A "court shall grant summary judgment if the movant shows that

---

[2]  The 2008 amendments "primarily" revised "the ADA's definition of 'disability,'" DeWitt v. SW Bell Tel. Co., 845 F.3d 1299, 1303 n.1 (10th Cir. 2017), an issue not presented in this case.  In light of that, "we freely rely on authorities prior to ADAAA's effective date that apply and construe the ADA, insofar as they are relevant."  Id.

[3] Aubrey moved for partial summary judgment on the question of whether she had a disability for ADA purposes.  The district court denied that motion as moot after granting Weld County summary judgment on all claims.  Aubrey does not challenge that decision on appeal.  However, given our other rulings, Aubrey would be free to renew her partial summary judgment motion on remand.

10

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In applying this test, we consider the evidence in the light most favorable to the non-moving party. For there to be a "genuine" dispute of fact, there must be more than a mere scintilla of evidence; to avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.

Rocky Mountain Prestress, 960 F.3d at 1259 (citation, internal quotation marks, alteration omitted).

## III. DISCUSSION

Our analysis of Aubrey's ADA claims also applies to her claims asserted under the Rehabilitation Act and CADA.[4] We, therefore, focus on Aubrey's three ADA claims, alleging that the County 1) failed to accommodate her disability,

---

[4] See 42 U.S.C. § 12201 (ADA providing that, "[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title"); Colo. Rev. Stat. § 24-34-405(6) (CADA providing that, "[e]xcept when federal law is silent on the issue, this section shall be construed, interpreted, and applied in a manner that is consistent with standards established through judicial interpretation of . . . titles I and V of the federal 'Americans with Disabilities Act of 1990', as amended, 42 U.S.C. sec. 12111 et seq."); see also Rivero v. Bd. of Regents of Univ. of N.M., 950 F.3d 754, 758 (10th Cir. 2020) (noting that, because Rehabilitation Act incorporates ADA standards, ADA case law applies to Rehabilitation Act claims and vice versa); Unrein v. PHC-Fort Morgan, Inc., No. 17-cv-02846-REB-SKC, 2020 WL 2465719, at *1 (D. Colo. May 13, 2020) (noting that, because they are "parallel statutes," the CADA should be interpreted consistent with the ADA "[w]henever possible), appeal filed, (10th Cir. June 15, 2020) (No. 20-1219). Neither the parties nor the district court separately analyzed Aubrey's Rehabilitation Act and CADA claims; neither do we.

2) discriminated against her because of her disability, and 3) retaliated against her for requesting an accommodation.

**A. Failure to accommodate Aubrey's disability**

Aubrey alleged that the County discriminated against her on the basis of disability by not making a reasonable accommodation for her known disability and, instead, terminated her. The ADA prohibits a "covered entity" from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). The ADA defines "discriminate against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." Id. § 12112(b)(5)(A).

Based on the language of the statute, then, there are generally four elements Aubrey had to show to establish a prima facie failure-to-accommodate claim: 1) she was disabled, 2) she was otherwise qualified, 3) she requested a plausibly reasonable accommodation, and 4) the County refused to accommodate her disability. See Lincoln v. BNSF Ry., 900 F.3d 1166, 1204 (10th Cir. 2018); McFarland v. City & Cty. of Denver, 744 F. App'x 583, 586 (10th Cir. 2018) (unpublished); Spielman v. Blue Cross Blue Shield of Kan., Inc., 33 F. App'x 439, 443 (10th Cir. 2002)

12

(unpublished).[5][6]  Establishing a prima facie claim is not onerous.  See Osborne v. Baxter Healthcare Corp., 798 F.3d 1260, 1266 (10th Cir. 2015).  If Aubrey established a prima facie claim—as we conclude she did—the burden then shifted to the County "to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer."  Lincoln, 900 F.3d at 1204 (internal quotation marks omitted).

> "If the employer does either of the above, summary judgment will be appropriate for the employer unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of . . . her prima face case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements."

Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir. 2017) (quoting Smith v. Midland Brake, Inc., 180 F.3d 1154, 1179 (10th Cir. 1999) (en banc)).

This general analytical framework is useful in the context of a failure-to-accommodate claim, "not to probe the subjective intent of the employer," which is not at

---

[5]  Though unpublished, the panel finds the reasoning in McFarland and Spielman helpful.

[6] The Tenth Circuit is currently considering, en banc, whether a plaintiff asserting a failure-to-accommodate claim must also prove that she suffered an adverse employment action, in addition to the employer's failure to accommodate her disability.  See Exby-Stolley v. Bd. of Cty. Comm'rs, 906 F.3d 900, 902, 908 (10th Cir.), reh'g en banc granted, 910 F.3d 1129 (10th Cir. 2018).  Here, Aubrey has easily established that the County took adverse action against her by terminating her employment.  So, we see no need to hold this opinion until the en banc Tenth Circuit decides the Exby-Stolley opinion.

issue, but instead to "determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered." Smith, 180 F.3d at 1179 n.12; see also Punt, 862 F.3d at 1050.

### 1. Aubrey's prima facie claim

Reiterating, to establish a prima facie failure-to-accommodate claim, Aubrey had to show 1) she was disabled, 2) she was otherwise qualified, 3) she requested a plausibly reasonable accommodation, and 4) the County refused to accommodate her disability. See Lincoln, 900 F.3d at 1204; McFarland, 744 F. App'x at 586; Spielman, 33 F. App'x at 443. As explained, she succeeded in making that showing.

### a. Aubrey was disabled for ADA purposes

As a starting point, disability, for purposes of the ADA, includes "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." Id. § 12102(4)(D). Aubrey asserted that PRES, when active, affects major life activities such as concentrating, interacting with others, seeing, thinking, and taking care of one's self. The County conceded, for purposes of its summary judgment motion, that Aubrey was thus disabled for purposes of the ADA.

### b. Aubrey is otherwise qualified

Regarding the second element of Aubrey's prima facie claims, the ADA prohibits a "covered entity" from "discriminat[ing] against a qualified individual on

14

the basis of disability." 42 U.S.C. § 12112(a) (emphasis added). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8).

No one disputes that Aubrey was qualified for her position before she began suffering from PRES. Nor does Aubrey assert that she could have returned to her job in April 2015 without an accommodation. Therefore, to meet the second element of her failure-to-accommodate claim, she had to show that there was a reasonable accommodation that would have enabled her to perform the essential functions of her job, at the time she was terminated or soon thereafter. See Lincoln, 900 F.3d at 1205. As explained in the next section of this opinion, Aubrey succeeded in asserting several such reasonable accommodations. A reasonable jury, therefore, could find that she was otherwise qualified.

### c. Aubrey requested a plausibly reasonable accommodation

To meet the third element of her prima facie failure-to-accommodate claim, Aubrey had to establish that she requested a plausibly reasonable accommodation. An employer cannot be liable for failing to accommodate a disability if it is unaware of the need for an accommodation. See Punt, 862 F.3d at 1048 (citing Smith, 180 F.3d at 1171-72); EEOC v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011).

"[T]he term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the essential

15

functions of his job." Lincoln, 900 F.3d at 1205 (internal quotation marks

omitted). The ADA provides that a "reasonable accommodation" may include—

> **(A)** making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> **(B)** job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). "The determination of whether a requested accommodation is

reasonable must be made on the facts of each case taking into consideration the particular

individual's disability and employment position." Punt, 862 F.3d at 1050 (internal

quotation marks omitted).

> **i. A jury could find that the County failed to engage in an interactive process with Aubrey to determine if there was a reasonable accommodation that would have enabled her to perform the essential functions of her job**

The district court determined that during the pre-termination meeting, Aubrey

suggested three accommodations: (1) more time to obtain her neurologist's

certification that she could return to work, (2) retraining, and (3) reassignment to the

Office Tech II position. Those requests triggered the County's duty to engage in

good faith with Aubrey in an interactive process to determine her limitations and

consider whether the accommodations she requested, or perhaps others that might

come to light during this interactive process, would enable Aubrey to return to work.

See DeWitt, 845 F.3d at 1315-16; see also Smith, 180 F.3d at 1172 ("The interactive

process is typically an essential component of the process by which a reasonable

16

accommodation can be determined."). See generally Smith, 180 F.3d at 1171-74 (discussing this interactive process to determine whether there is a reasonable accommodation that would allow a disabled employee to return to work).

The obligation to participate in this interactive process is inherent in the statutory requirement that the employer offer a disabled, but otherwise qualified employee a reasonable accommodation. See Smith, 180 F.3d at 1172; see also Wilkerson v. Shinseki, 606 F.3d 1256, 1266 (10th Cir. 2010) (Rehabilitation Act claim). The interactive process requires the good faith participation of both the employer and employee. See Smith, 180 F.3d at 1172; see also Wilkerson, 606 F.3d at 1266. "While '[t]he exact shape of this interactive dialogue will necessarily vary from situation to situation and no rules of universal application can be articulated[,]' '[t]he interactive process [necessarily] includes good-faith communications between the employer and employee.'" Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 916 (10th Cir. 2004) (quoting Smith, 180 F.3d at 1172-73). This is imperative because each side will possess different information, all of which is critical to determining whether there is a reasonable accommodation that might permit the disabled employee to perform the essential functions of her job.

Ultimately, the problem in this case was that the County did not engage in this interactive process, or at least there is certainly evidence from which a reasonable jury could find that to be the case. See id. The County contends it did engage in an interactive process with Aubrey during the pre-termination hearing. But, from the transcript of that hearing and the circumstances surrounding it, a jury could find that

17

County officials made no effort to discover exactly what Aubrey's limitations were at that time, nor in exploring with Aubrey whether there were any accommodations that would have enable her to return to work at that time, or in the near future, even with her limitations.

For example, although Aubrey knew that, in order to return to work, she had to have a physician certify that she was fit for duty, the County had not previously notified Aubrey that she would have to have that certification by April 16. Instead, the County extended her leave without pay indefinitely, knowing Aubrey's doctors, during the early stages of her illness, had indicated that she would not be able to return to work for six months. A reasonable jury could find that Aubrey reasonably believed that the County had approved unpaid leave until July 31 or August 1, well after the date of her termination. Moreover, a reasonable jury could find that the County foreclosed the possibility that Aubrey could obtain a doctor's fitness-for-duty certification on April 16 by giving her less the twenty-four-hours' notice of the pre-termination meeting and not giving her any additional time after that meeting to attempt to obtain the needed information from her treating health care providers. Cf. Wells v. Shalala, 228 F.3d 1137, 1143, 1145-46 (10th Cir. 2000) (holding, under Rehabilitation Act, that employer was not liable for failing to accommodate employee's disability where employee failed to participate in interactive process because, "despite ample time to do so," he failed to provide employer "with any medical documentation to support" his requested accommodation (emphasis added)).

18

Furthermore, the County's refusal to give Aubrey any additional time to obtain updated information from her doctors was contrary to the County's usual procedure when an employee sought an accommodation for a disability. Ordinarily, the County would provide that employee a County form to take to the employee's doctor to find out what accommodations are needed and then give the employee approximately fifteen days, perhaps more if necessary, to get the form completed. No one gave Aubrey such a form prior to the pre-termination meeting, nor was she afforded <u>any</u> time to gather that updated medical information. Clerk and Recorder Koppes then incongruously complained during her deposition that Aubrey had not provided her with any medical documentation of Aubrey's limitations.

Further, Koppes testified at her deposition that, before the meeting (and contrary to what was asserted in the pre-termination notice letter), Koppes did not know anything about Aubrey's medical problems. Nor did County officials ask Aubrey during the meeting about her limitations resulting from her disability. <u>See</u> <u>Bartee</u>, 374 F.3d at 916 (considering fact that employer did not inquire about disabled employee's restrictions as evidence that employer failed to participate in interactive process). Nor did these officials explore what retraining Aubrey might need, once she raised that possibility during the meeting. <u>See</u> <u>id.</u> (considering fact that employer did not inquire as to what accommodations disabled employee needed as evidence that employer failed to participate in interactive process). "Neither party may create or destroy liability by causing a breakdown of the interactive process." <u>Albert v. Smith's Food & Drug Ctrs., Inc.</u>, 356 F.3d 1242, 1253 (10th Cir. 2004).

19

This evidence further calls into question Koppes's deposition testimony that, before terminating Aubrey, Koppes and her deputy considered whether Aubrey could perform <u>any</u> job existing in the Clerk and Recorder's Office, but concluded that, with her limitations, she could not. But a jury could find that Koppes did not know what Aubrey's limitations were. Koppes testified that she did not know what Aubrey's medical problems were before the meeting, did not ask Aubrey during the hearing whether she could perform the essential functions of her position, did not give Aubrey a chance to obtain updated medical documentation of her limitations, and misstated Aubrey's limitations in the termination letter and during Koppes's deposition.

In light of this record, then, a reasonable jury could find that the County failed to meet its obligation of engaging with Aubrey in good faith in an interactive process to identify her precise limitations and to explore whether there was any accommodation that could enable Aubrey to return to work and perform the essential functions of her job. <u>See id.</u> In fact, a reasonable jury could find that the County affirmatively acted to avoid having to consider possible accommodations by cutting off Aubrey's opportunity to obtain the needed return-to-work certification or other medical information regarding her limitations and essentially ignoring any possible accommodation Aubrey suggested during the pre-termination meeting.

It may be that the County confused the standard for a <u>reasonable accommodation dialogue</u> under the ADA, the Rehab Act, and CADA, with the quite different <u>due process</u> requirement of simply providing an employee notice and an

20

opportunity to be heard before terminating that employee. See LaChance v. Erickson, 522 U.S. 262, 266 (1998). The evidence could support a jury conclusion that it was only a due process hearing that the County offered Aubrey at its April 16 pre-termination meeting. However, that does not satisfy the County's obligations under the ADA, the Rehabilitation Act, and the CADA to engage in an interactive dialogue with Aubrey to try to determine whether a reasonable accommodation is possible. Human Resources Director Russell opened that hearing by explaining to Aubrey that this was her "opportunity to tell us why we shouldn't dismiss you." (Aplt. App. 247.) Different than a due-process hearing, however, the ADA contemplates a much more collaborative interactive process when a disabled employee seeks an accommodation that will enable the employee to continue performing the essential functions of her job. The ADA contemplates an affirmative obligation to undertake a good faith back-and-forth process between the employer and the employee, with the goal of identifying the employee's precise limitations and attempting to find a reasonable accommodation for those limitations. See Smith, 180 F.3d at 1171-74; see also Albert, 356 F.3d at 1253. There may not always be a workable accommodation, but the ADA mandates that the employer work with the employee to try to find one. See Albert, 356 F.3d at 1253. A jury could certainly find that that did not happen here.

### ii. Aubrey's requested accommodations

Notwithstanding this strong evidence that the County failed to meet its obligation to participate with Aubrey in the interactive process to determine if she

21

could return to work, Aubrey still had to establish that there was, in fact, a reasonable accommodation that would have enabled her to perform the essential functions of her job, or another job to which the County could have re-assigned her. See Smith, 180 F.3d at 1174 ("Even if [the employer] failed to fulfill its interactive obligations to help secure a reassignment position, Smith will not be entitled to recovery unless he can also show that a reasonable accommodation was possible and [in that case] would have led to a reassignment position."); see also Lincoln, 900 F.3d at 1207 n.29; Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1265 (10th Cir. 2009); Frazier v. Simmons, 254 F.3d 1247, 1261-61 (10th Cir. 2001); Boykin v. ATC/VanCom of Colo., L.P., 247 F.3d 1061, 1065 (10th Cir. 2001). We note, however, that "an employer's failure to engage in the interactive process will often make it difficult to resolve a case for the employer on summary judgment" on this ground. Valdez v. McGill, 462 F. App'x 814, 819 n.5 (10th Cir. 2012) (unpublished).[7] That is because, "when the employer fails to engage in the interactive process, 'it is not likely that an employer will be able to establish on summary judgment the absence of a disputed fact as to the existence of a reasonable accommodation.'" Id. (quoting Morton v. United Parcel Serv., Inc., 272 F.3d 1249, 1256 n.7 (9th Cir. 2001), overruled on other grounds by Bates v. United Parcel Serv., Inc., 511 F.3d 974, 995-96, 998 (9th Cir. 2007) (en banc)).

We consider, then, whether there was a reasonable accommodation that would have enabled Aubrey to perform the essential functions of her job in April 2015, or soon

---

[7] Although unpublished, we deem Valdez persuasive on this point.

22

thereafter. Whether an accommodation is reasonable is a mixed question of law and fact. See Osborn, 798 F.3d at 1267. To determine whether an accommodation is reasonable, the Tenth Circuit prescribes another burden-shifting formula. See id. at 1267-68 (citing White v. York Int'l Corp., 45 F.3d 357, 361 (10th Cir. 1995)). "First, the employee 'need only show that an "accommodation" seems reasonable on its face, i.e., ordinarily or in the run of cases.'" Id. at 1267 (quoting US Airways, Inc. v. Barnett, 535 U.S. 391, 401 (2002)). "A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue." Id. (citing 29 C.F.R. § 1630.2(*o*)(1)(ii)).

"Second, if the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate. The employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" Id. (quoting Barnett, 535 U.S. at 402) (citation, further internal quotation marks, alteration omitted).

"Third, if the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." Id. at 1268 (internal quotation marks, alteration omitted).

With these principles in mind, we address each of the three accommodations Aubrey suggested during the pre-termination hearing.

### *a*. **Additional time to consult with her neurologist**

Aubrey requested additional time—until May 22—to see her neurologist. "It is well-settled that a request for leave may lead to a 'reasonable' accommodation." Punt, 862 F.3d at 1051; see also C.R. England, 644 F.3d at 1048-49. On the other hand, "employers are not obligated to retain a disabled employee on unpaid leave indefinitely or for an excessive amount of time." Boykin, 247 F.3d at 1065; see also Punt, 862 F.3d at 1051 ("Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job in the near future and therefore whether the leave request is a 'reasonable' accommodation." (internal quotation marks omitted)).

In concluding Aubrey's request for additional time was not reasonable, the district court deemed Aubrey to be requesting an indefinite amount of time off, noting that even if the County waited for Aubrey to see her neurologist, there was no telling what he would say about her continuing limitations. But Aubrey was not asking for an indefinite amount of time off. Early in her recovery from PRES—in January, February and early March—Aubrey's medical providers had already indicated that Aubrey would be able to return to work in approximately six months, on July 31 or August 1, 2015. So her request in April for additional time to see her neurologist was not open-ended.

This distinguishes the situation presented here from the cases on which the district court relied—Cisneros, Hudson, and Brockman. In Cisneros v. Wilson, the employee's doctors indicated that the duration of her impairment was unknown. 226 F.3d 1113, 1129 (10th Cir. 2000), overruled on other grounds by Bd. of Trustees of Univ. of Ala. v.

24

Garrett, 531 U.S. 356 (2001).  In Hudson v. MCI Telecommunications Corp., the employee similarly "failed to present any evidence of the expected duration of her impairment as of the date of her termination."  87 F.3d 1167, 1169 (10th Cir. 1996); see also Brockman v. Wyo. Dep't of Family Servs., 342 F.3d 1159, 1168 (10th Cir. 2003) (stating that "employer is not required to wait indefinitely for an employee to recover," in case where employer "had good reason to believe at the point that it terminated [employee] that she might never return to work" (internal quotation marks omitted)).

Furthermore, during the pre-termination meeting in mid-April, Aubrey told the County that she was recovering at a quicker rate than her medical providers had originally expected.  In light of that, Aubrey's request in mid-April for some additional time to gather updated medical information as to when her doctors would release her to return to work was a plausibly reasonable accommodation.

The County contends that it was unable to grant Aubrey any additional time off because the Clerk and Recorder's office could no longer function with Aubrey's position unfilled.  But the County employee who had been temporarily assigned to Aubrey's position remained there through most of June.  Aubrey was, in fact, able to get clearance to return to work from one of her doctors on June 4.  From this evidence, a jury could find that Aubrey, in mid-April, requested a plausibly reasonable accommodation; at that time, this accommodation would have permitted her to return, in the near future, to performing the essential functions of her job; and the accommodation did not present an undue hardship to the County.  That evidence is

25

sufficient for Aubrey's failure-to-accommodate claim to survive summary judgment and let a jury decide these issues.[8]

### b. Retraining

Aubrey also suggested during the pre-termination meeting that she would be able to return to her job if the County provided retraining. Retraining is generally a plausibly reasonable accommodation. See Wilkerson, 606 F.3d at 1265. Human Resources Director Russell similarly testified at her deposition that retraining is a reasonable accommodation and that she had never known any County supervisor to deny it. But Koppes complained at her deposition that Aubrey never explained what she meant by needing to be "somewhat retrained." (Aplt. App. 528.) The district court rejected this suggested accommodation for the same reason. Of course, if the pre-termination hearing had actually involved an interactive process, Koppes would have asked Aubrey exactly what retraining she needed and Aubrey, Koppes and Russell could have then explored that possibility in an informed way. Instead, neither Koppes nor Russell asked Aubrey about what retraining she might require. See Bartee, 374 F. 3d at 916 (holding there was sufficient evidence for jury to find that employer failed reasonably to accommodate employee where employer did not inquire of employee about his restrictions or the accommodations he might need to

---

[8] The County also contends that it would have been an undue hardship to extend Aubrey's unpaid leave because Koppes considered all the jobs in the Clerk and Recorder's recording division and Aubrey could not do any of them. But that assertion does not address why the County was unable to provide Aubrey with additional time off to get her doctors' certificates.

26

perform his job).  Instead, in her deposition, Koppes justified terminating Aubrey by speculating that she would have needed "more than just a little bit of prompting," and would have instead required someone sit by her side constantly helping (Aplt. App. 529), which Koppes testified was more help than the Clerk and Recorder's office could have afforded to provide Aubrey.

In fact, Aubrey's request for retraining was not that unclear.  She indicated she was just beginning to remember the functions she was required to perform in doing her job.  A jury could find that her request for retraining would have involved someone showing her what was required to perform her job and how to do that— retraining.  A jury could further find that Aubrey's retraining request was a plausibly reasonable accommodation that would have enabled Aubrey to perform the essential functions of her job, and could reject Koppes's assertion that she could not provide that accommodation.

### *c*. Reassignment

Aubrey also suggested during the pre-termination hearing that she be reassigned from her Office Tech III position to an Office Tech II position, knowing there was a vacant Office Tech II position in the elections department. Reassignment, too, is a plausibly reasonable accommodation.  The ADA itself expressly recognizes reassignment can be a reasonable accommodation.  See 42 U.S.C. § 12111(9)(B); see also Lincoln, 900 F.3d at 1204-05.  If the employee is unable to return to her previous job, reassignment to a vacant position can be a reasonable accommodation and is particularly amenable to consideration during a

27

genuine interactive process between the employee and employer.  See Smith, 180

F.3d at 1159-67, 1170-74; see also Lincoln, 900 F.3d at 1204-05 (holding Smith

remains good law after US Airways, Inc. v. Barnett, 535 U.S. 391 (2002)); Duvall v.

Georgia-Pacific Consumer Prods., L.P., 607 F.3d 1255, 1260 (10th Cir. 2010) (citing

Smith, 180 F.3d at 1177).  Further, Aubrey was able to identify a specific

reassignment, the Office Tech II position open in the elections division.  See Sanchez

v. U.S. Dep't of Energy, 870 F.3d 1185, 1200 (10th Cir. 2017) (Rehabilitation Act

case); Koessel v. Sublette Cty. Sheriff's Dep't, 717 F.3d 736, 745 (10th Cir. 2013).

That is sufficient to meet her prima facie burden.[9]

### iii.  Aubrey's applications for disability benefits

Aubrey has, then, sufficiently established three plausibly reasonable

accommodations that a jury could find would have permitted her to return to

performing the essential functions of her job.  The County next asserts that her

claimed reasonable accommodations are undercut by her April 20 application for

long-term disability and her later application for social security disability benefits, in

---

[9] During the pre-termination meeting, County officials were quick to assure the soon-to-be terminated Aubrey that, if she recovered sufficiently and there was an opening in the Clerk and Recorder's office, Koppes would consider hiring her again.  But reassignment to a vacant position as a reasonable accommodation generally means the disabled employee is entitled to that position without having to compete with other applicants.  Lincoln, 900 F.3d at 1204-05 (citing Smith, 180 F.3d at 1166-67).  Assuring a disabled employee that she could compete for future available jobs, then, is not an accommodation.  See Davoll v. Webb, 194 F.3d 1116, 1131-32 (10th Cir. 1999) (citing Smith, 180 F.3d at 1165).

which she swore under oath that she was unable to perform her job. That, however, presents a question for a jury.

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 807 (1999).

We have concluded that Aubrey has produced sufficient evidence from which a reasonable jury could find that, on or near April 16, 2015, she was able to perform the essential functions of her job with reasonable accommodation. Aubrey's long-term disability policy defined disabled as being unable to perform the essential functions of her Office Tech III job without taking into account any reasonable accommodations. See Rascon v. US W. Commc'ns, Inc., 143 F.3d 1324, 1330-31 (10th Cir. 1998), overruled on other grounds, N. Hamp. v. Maine, 532 U.S. 742 (2001). The same is true of Aubrey's social security disability application, see id., which, in any event, was unsuccessful. See Cleveland, 526 U.S. at 803, 805. The sworn assertions Aubrey made when she applied for disability benefits, therefore, do not warrant summary judgment for the Defendants.

29

#### d. The County did not accommodate Aubrey's disability

There is no dispute that Aubrey established the fourth element of her prima facie claim—that, although aware of her need for an accommodation, the County did not provide any. See McFarland, 744 F. App'x at 586; Spielman, 33 F. App'x at 443.

### 2. The County presented evidence challenging Aubrey's prima facie claim, but disputed material issues of fact require a trial

To summarize, Aubrey presented sufficient evidence to establish a prima facie failure-to-accommodate claim: 1) she was disabled, 2) but otherwise qualified, 3) her requests for additional time to see her neurologist, for retraining, and/or for possible assignment to a Tech II position were plausibly reasonable accommodations, and 4) the County refused to accommodate her disability. That shifted the burden to the County "to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." Lincoln, 900 F.3d at 1204 (internal quotation marks omitted). As our previous discussion indicates, the County presented evidence to meet its burden, and Aubrey responded with evidence sufficient "to establish at least a genuine dispute of material fact" to enable her failure-to-accommodate claim to survive summary judgment. Punt, 862 F.3d at 1050 (quoting Smith, 180 F.3d at 1179). Therefore, the district court erred in granting the County summary judgment on this claim. See Smith, 180 F.3d at 1179 ("After considering the submissions by both sides on summary judgment, if there remains genuine evidence supporting each element of the employee's prima facie case and, if need

be, disputing the employer's affirmative defenses, summary judgment for the employer should be denied and the matter must proceed to trial.").

## B. Discrimination against Aubrey because of her disability

Aubrey next alleged that the County discriminated against her on the basis of her disability when it terminated her employment. See 42 U.S.C. § 12112(a) (prohibiting discrimination "against a qualified individual on the basis of disability in regard to . . . discharge of employees"). Different than her failure-to-accommodate claim, to recover on her discrimination claim, Aubrey must prove that the County acted with a discriminatory animus against her because she had a disability. See Lincoln, 900 F.3d at 1204.

### 1. Aubrey's prima facie claim

Where, as here, there is no direct evidence of the County's discriminatory animus, we apply the McDonnell-Douglas burden-shifting analysis.[10] See Lincoln, 900 F.3d at 1192. At the first step of that analysis, Aubrey had "to establish a prima facie case of discrimination by showing (1) that [s]he is disabled within the meaning of the ADA; (2) that [s]he is qualified for the job held or desired; and (3) that [s]he was discriminated against because of h[er] disability." Id. (internal quotation marks omitted). Again, establishing a prima facie claim is not onerous. See Osborn, 798 F.3d at 1266. Aubrey has succeeded in asserting a prima facie claim here. As previously discussed, the County conceded for summary judgment purposes that

---

[10] McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).

31

Aubrey was disabled, and Aubrey presented sufficient evidence that she was otherwise qualified. As for the third element, the ADA defines "discrimination" to include "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A); see also Smith, 180 F.3d at 1161. Aubrey satisfied that element as well.

**2. The County's legitimate, non-discriminatory reason for terminating Aubrey**

It has been the County's position throughout this litigation that Aubrey was unable to perform the essential duties of her job (an Office Tech III in the recordings division), or an Office Tech II position, and that it would have been an undue hardship to the County to hold Aubrey's position open any longer.

**3. Pretext**

It was then Aubrey's burden to show that the County's justification for terminating her was a pretext for disability discrimination. See Lincoln, 900 F.3d at 1193.

> A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision. This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.

Id. (internal quotation marks, citations omitted).

Aubrey has asserted sufficient evidence to create a triable question as to pretext. In particular, a jury could find that the reasons the County gave for terminating Aubrey, in its termination letter and through County officials' deposition

32

testimony, were unworthy of belief because they were inaccurate or even false. Briefly summarized here, those inaccuracies included stating that Aubrey had indicated during the pre-termination hearing that she could not return to work until July 31, when in fact she had not stated that; indicating Aubrey could not see, when she could; and indicating Aubrey could not use a computer or telephone, when she stated during the hearing that she was using a computer and there was no indication that she could not use a telephone.

In addition, a jury could further infer that the County had acted with a discriminatory animus from the manner in which the County conducted the pre-termination hearing. For example, the County did not contact Aubrey for months, waiting until less than twenty-four hours before the hearing to notify Aubrey of the hearing and the need for her to present updated medical information, waiting until the hearing to ask if she had a return-to-work certification, and then not allowing her the usual two weeks given other employees to obtain medical documentation to support her requested accommodations. County officials also failed to inquire at the hearing about Aubrey's limitations or what retraining she might require, after Aubrey raised that possibility. From this evidence, a jury could find that the County acted with a discriminatory animus when it terminated her employment. Aubrey's disability discrimination claim, therefore, was sufficient to survive summary judgment. Thus, we reverse the district court's grant of summary judgment on this claim and remand it to the district court for further proceedings.

## C. Retaliation for requesting an accommodation

Lastly, Aubrey claims that the County retaliated against her by firing her because she asked the County to accommodate her disability. The district court concluded Aubrey had established a prima facie retaliation claim by showing 1) she engaged in activity protected under the ADA; 2) the County took action against Aubrey that an objectively reasonable employee would have found adverse; and 3) a causal connection between Aubrey's protected conduct and the County's adverse action to justify inferring that the County took that action because of Aubrey's protected conduct. See Lincoln, 900 F.3d at 1209. Protected activity includes requesting an accommodation, see id., and adverse action taken in close temporal proximity to protected activity may be considered in establishing a causal connection, see Hennagir, 587 F.3d at 1266.

The County contends it terminated Aubrey for a legitimate, non-retaliatory reason, see Foster v. Mountain Coal Co., 830 F.3d 1178, 1186 (10th Cir. 2016)— because Aubrey could not perform the essential functions of her position and the County could no longer wait for her to recover.

Aubrey then had to show that the County's reasons for terminating her were merely a pretext for retaliating against her for seeking an accommodation for her disability. See id. Aubrey failed to do so. While there are reasons for disbelieving the County's asserted reasons for terminating Aubrey, there is no evidence in the record to support a jury finding that the real reason the County terminated Aubrey was because she asked the County to accommodate her disability. Said another way, there is no evidence

from which a jury could find that the County did not intend to fire Aubrey until she asked for an accommodation.

## IV. CONCLUSION

We AFFIRM the district court's decision to grant the County summary judgment on Aubrey's retaliation claims asserted under the ADA, the Rehabilitation Act and Colorado's Anti-Discrimination Act.  But we REVERSE summary judgment for the County on Aubrey's failure-to-accommodate and disability discrimination claims asserted under those three statutes and REMAND those claims to the district court for further proceedings.