**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JAMIE HERRMANN,

     Plaintiff - Appellant,

v.

SALT LAKE CITY CORPORATION, Salt
Lake City Justice Court,

     Defendant - Appellee.

No. 20-4063

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:17-CV-00324-CW)**
_____

Laura Henrie (Mary Anne Davies and Katherine Bushman, with her on the briefs),
Disability Law Center, Salt Lake City, Utah, appearing for Appellant.

Samantha J. Slark (Jonathan G. Pappasideris, with her on the brief), Salt Lake City
Corporation, Salt Lake City, Utah, appearing for Appellee.
_____

Before **MORITZ**, **KELLY**, and **BRISCOE**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

Plaintiff Jamie Herrmann appeals the district court's grant of summary

judgment to Defendant Salt Lake City Corporation ("the City") on her claims for

failure to accommodate her disability, disability discrimination, and retaliation under

the Americans with Disabilities Act ("ADA"), as amended. 42 U.S.C. § 12101 *et seq*. We REVERSE the district court's grant of summary judgment on Herrmann's failure to accommodate claim and REMAND for further consideration. We AFFIRM the district court's grant of summary judgment on Herrmann's disability discrimination and retaliation claims.

## I

Herrmann began working for the City in 2002 and successfully held different positions in the Salt Lake City Justice courts for nine years. Starting in 2011, Herrmann began working as an in-court clerk, which required her to spend more time in court than her previous positions.

Herrmann has PTSD, stemming from a nearly decade-long abusive marriage. Her presence in the courtroom during domestic violence cases frequently triggered her anxiety, causing severe migraines that could last for several days at a time and resulting in a significant downturn in her productivity. As Herrmann's work performance suffered, she had several meetings with supervisors, received written warnings, and was ultimately suspended for two days in July 2014. Throughout this time, Herrmann took intermittent leave under the FMLA for health conditions, including the exacerbation of her PTSD.

A few months before her suspension, in May 2014, Herrmann contacted Melissa Green, the City's Equal Opportunity Program Manager, about a potential accommodation under the ADA. Green sent Herrmann paperwork to fill out, and two months later, Herrmann's clinical social worker, Gary Klein, submitted paperwork to

2

Green. Klein noted that Herrmann's presence in court while domestic violence cases were being heard triggered her PTSD, which exacerbated her anxiety and clinical depression. Klein stated that "[a]ny reasonable accommodations that would eschew a spike in anxiety would likely yield positive results for Ms. Herrmann as well as those with whom she works." Joint Appendix ("JA") at 295.

Herrmann met with Green on August 7, 2014, to request that she be removed from all domestic violence cases. Green then spoke with court managers Curtis Preece and Tammy Shelton about whether that request could be accommodated. Preece and Shelton told Green that all of Herrmann's duties as a court clerk could result in contact with domestic violence cases, whether in or out of a courtroom. Green emailed Herrmann on August 15, 2014, asking whether Herrmann was requesting total removal from any work on domestic violence cases or if she could still perform out-of-court clerical work relating to domestic violence cases. Herrmann responded that she would prefer to meet with Green in person to discuss the matter, so the two set a meeting for August 20, 2014. But Herrmann left work early that day due to a migraine, did not attend the meeting, did not tell Green that she would miss the meeting, and did not attempt to reschedule or follow up with Green. Green followed up, but Herrmann did not respond because she did not have access to her work email while recovering at home from her migraine.

On August 25, 2014, Klein requested six months of FMLA leave for Herrmann. In the paperwork, Klein specifically noted that the probable duration of Herrmann's elevated PTSD symptoms was three to six months, and he later followed

3

up to state that she could likely return to work after treatment. The City approved continuous FMLA leave for Herrmann, but only through October 14, 2014. On September 15, 2014, Green again asked for clarification on the scope of Herrmann's ADA accommodation request. Herrmann responded via email but explained only why she did not attend the scheduled meeting with Green the month before.

On September 22, 2014, Herrmann updated her accommodation request via email, writing, "My counselor and Dr want to request as part of the accommodation that I do not return to the court but a different position within Salt Lake City Corporation." *Id.* at 370. Green responded that the City would consider reassignment to an open position if the City determined that Herrmann could not reasonably be accommodated in her current position. Green further explained that she would rely on the ADA paperwork submitted by Klein in July 2014 and that if Herrmann desired, she could update her paperwork.

Accordingly, on October 7, 2014, Klein submitted new paperwork on Herrmann's behalf. Klein reiterated that Herrmann's PTSD is triggered by listening to domestic violence cases in court, resulting in heightened stress levels and migraines, among other things. Klein also explained his belief that Herrmann's heightened stress levels were exacerbated by her supervisors, noting a tape recording of an interaction between Herrmann and her supervisors, writing: "The interactions I heard on the recordings are counter-productive for someone with PTSD." *Id.* at 375. Klein therefore recommended that Herrmann "take enough time off" so that her stress levels could reset, and that she be moved to a different department. *Id.* Klein noted

4

that "[t]here is a high probability [Herrmann] will be able to return to a productive work life in a different department." *Id.* In the section of the paperwork for suggested accommodations, Klein wrote:

> I would recommend Ms. Herrmann be given the opportunity to work in a different department with different supervisors. Finding a good supervisory fit is essential to her productivity. I would further recommend avoidance of any work related to domestic violence, as this triggers her PTSD, migraines[,] and results in her needing to take time off to recover.

*Id.*

Meanwhile, in early October 2014, Klein and Dr. Nancy Foster (another of Herrmann's medical providers) requested that Herrmann's FMLA leave be extended to November 30, 2014. The City approved an extension of FMLA leave, but only until November 13, 2014, when Herrmann would exhaust her twelve weeks of federally protected FMLA leave. In the notice approving the extension, the City's FMLA coordinator suggested that Herrmann contact Green for an ADA accommodation or submit a written request to Preece for departmental leave to receive leave beyond the FMLA-protected twelve weeks.

On October 15, 2014, Herrmann emailed Green inquiring about the status of her ADA request, noting that she was concerned about her "FMLA time running out on November 13, 2014." *Id.* at 377. Green wrote back the next day, saying that she reviewed Klein's paperwork and needed to listen to the recording that Klein referenced. Herrmann responded a week later that "the recordings are irrelevant to [Green] making the [ADA] accommodation." *Id.* at 376. Green clarified that because

5

Klein's recommended accommodation was based on his view that Herrmann's supervisors were not a good fit, she needed to understand what was a bad fit before she could determine what might be a good one. At a meeting on October 28, Herrmann played a portion of the recording, but the batteries in her tape recorder died. Green said she did not hear any of the conduct Herrmann or Klein had described. Herrmann claimed she had another recording of her supervisor yelling at her but was not comfortable leaving the tape recorder with Green and told her that she would get back to her with that recording.

On November 4, 2014, Preece, on behalf of the City, sent Herrmann a "Notice of Intent to Separate from Employment Due to Unavailability" ("the Notice"). *Id.* at 428–29. The Notice informed Herrmann that:

> [E]ffective November 13, 2014, you will have exhausted all approved FMLA leave time. Based on the information you provided to the City, I understand you will not be able to return to work until November 30, 2014. . . .
>
> [E]mployees may not be absent from the workplace unless the leave is protected under FMLA or is an approved leave of absence. . . .
>
> Although you were already using intermittent FLMA [sic] leave; you invoked your right to use continuous FMLA leave on August 20, 2014. As of today, I have not received a medical certification from your health care provider stating you are able to return to work on November 14, 2014.
>
> Although your protected leave under the FMLA will be exhausted, you may still qualify for a leave of absence. A department-approved leave of absence will allow you to continue your City benefits for a limited period of time. Even if you are granted a department-approved leave of absence, you may be separated from your position in our department without a right to return to work at the end of the leave. If you wish to

6

> apply for a department-approved leave of absence, please submit your written request to Curtis Preece by November 13, 2014.
>
> Since your inability to return to work is involuntary for medical reasons, this memorandum is notice of a proposed action which may affect your employment and gives you an opportunity to present alternatives. You may propose reasonable alternatives in writing that would allow you to return to work. Or, if you prefer, I would be glad to meet with you to discuss your circumstances, hear any potential proposals you may have, and answer any questions. . . .
>
> If you do not provide us with a response or alternative by the stated deadline, I intend to separate you from your employment with the City by no later than close of business on November 13, 2014.
>
> I understand you have been working with Melissa Green regarding an accommodation under the Americans with Disabilities Act (ADA). I encourage you to continue working with Ms. Green through this process. I also encourage you to contact Jodi Langford, Benefits Program Manager, to discuss any benefits you may have.

*Id.*

On November 7, 2014, Green wrote to Herrmann stating that she had still not received the recording or any other contact from Herrmann on the matter. Green stated that she needed the recordings and any other relevant information by November 13, 2014—the day Herrmann's FMLA leave expired—or else she would have "no option but to close your request for an accommodation." *Id.* at 379–80.

On November 11, 2014, Herrmann emailed Preece to request "an accommodation under my (ADA) Americans with Disabilities Act to extend the date, because I need more time to review this separation agreement." *Id.* at 431. Preece responded that Herrmann should contact Green regarding any ADA accommodation. On November 12, 2014, Herrmann emailed Green to request additional leave as an

accommodation for her disability. She stated that she thought the recordings were irrelevant to her request for accommodation. Herrmann also called Green four times to determine what she should do as her FMLA leave would expire the next day. Herrmann finally reached Green, and Green told Herrmann that she had not made any decision on the accommodation request. Herrmann offered to bring the recording to Green's office so she could listen to it again. Green declined.

Herrmann then called HR Representative Jennifer Sykes and asked her what she should do regarding the impending separation of her employment. Sykes responded that the City would not make a decision on Herrmann's employment until Green resolved the ADA accommodation request. Sykes did not clarify whether Herrmann needed to return to work the next day.

Herrmann was separated from her employment at the close of business on November 13. On November 14, Green sent a letter to Herrmann explaining that with the information she had, she was "unable to determine what type of supervisor may be best for [her]." *Id.* at 426–27. Green then closed Herrmann's accommodation request. Green's letter did not acknowledge that Herrmann had already been separated from her employment.

Herrmann attempted to return to work the following Monday, November 17, believing she was still employed. Herrmann was immediately escorted to Preece's office, where he told her that her employment had ended. Herrmann told Preece that she had a medical release from Klein and asked if she could retrieve it, but Preece responded that it was too late.

8

After receiving a notice of right to sue, Herrmann sued the City under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* Herrmann raised three claims under the ADA: (1) failure to provide reasonable accommodations, (2) disability discrimination, and (3) retaliation. The City moved for summary judgment on all three claims and the district court granted that motion. Herrmann appeals.

## II

We review the district court's grant of summary judgment against Herrmann de novo and apply the same standard as the district court. *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015). We view the facts in the light most favorable to Herrmann, drawing all reasonable inferences in her favor. *Id.* "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## A

The district court erred in granting summary judgment on Herrmann's failure to accommodate claim.

"The ADA prohibits employers from discriminating against 'a qualified individual on the basis of disability.'" *Id.* at 1266 (quoting 42 U.S.C. § 12112(a)). The ADA's definition of discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." 42 U.S.C. § 12112(b)(5)(A). To establish

9

a prima facie case of failure to accommodate, a plaintiff "must make an initial showing that '(1) she is disabled; (2) she is "otherwise qualified"; and (3) she requested a plausibly reasonable accommodation.'" *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017) (quoting *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012)). If a plaintiff makes a prima facie case, the burden shifts to the defendant to "present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense." *Id.*

A plaintiff need not establish discriminatory intent to show that an action was taken "on the basis of disability . . . . [b]ecause 'any failure to provide reasonable accommodations for a disability is necessarily because of disability.'" *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (quoting *Punt*, 862 F.3d at 1048). The City does not dispute that Herrmann is disabled or that she is otherwise qualified, so the only issue before us on the failure to accommodate claim is whether Herrmann requested a plausibly reasonable accommodation.

The district court granted the City summary judgment on Herrmann's three asserted plausibly reasonable requests: (1) removal "from all work regarding domestic violence cases"; (2) reassignment; and (3) additional leave. Aplt. Br. at 32. On appeal, Herrmann does not challenge the district court's grant of summary judgment to the City "on Herrmann's failure to accommodate [claim] related to removal from domestic violence cases." *Id.* at 22 n.3.

10

**1**

The ADA lists "reassignment to a vacant position" as a possible reasonable accommodation. 42 U.S.C. § 12111(9); *see also Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161 (10th Cir. 1999) (en banc). Once an employee requests reassignment as an accommodation, both the employee and employer have an obligation to engage in an interactive process, which "is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee," and "is typically an essential component of the process by which a reasonable accommodation can be determined." *Smith*, 180 F.3d at 1172. This interactive process requires "good-faith communications." *Id.*

To meet a prima facie case of reassignment as a reasonable accommodation, a plaintiff must make an initial showing that:

(1) The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his or her disability known to the employer;

(2) The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished[;]

(3) The employee requested the employer reasonably to accommodate his or her disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process, in which the employee in good faith was willing to, or did, cooperate;

(4) The employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made; and

11

(5) The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

*Id.* at 1179.

The district court determined that Herrmann did not establish a dispute of fact regarding the second element of this test—that the preferred option of accommodation within her existing job could not be reasonably accomplished—and, as a result, did not consider the other elements of the prima facie case. We disagree. Herrmann has established a dispute of fact on the second element of her prima facie case. We therefore reverse the district court as to that element and remand for consideration of elements three and four.

Herrmann did not respond to all of Green's inquiries, but Green learned from Preece and Shelton that it was not feasible to accommodate Herrmann by removing all domestic violence cases from her existing position. Further, Herrmann specifically requested reassignment to a different position with the City. Finally, Klein "recommend[ed] avoidance of *any* work related to domestic violence, as this triggers [Herrmann's] PTSD, migraines, and results in her needing to take time off to recover." JA at 375 (emphasis added). Viewing the facts in the light most favorable to Herrmann, we read these statements together. For summary judgment purposes, Herrmann "clarif[ied] the nature of her request" by showing that she could not be

accommodated in her current role and thereby she triggered the City's duty to consider reassignment.[1] Aplt. Br. at 25.

The City argues that Herrmann's request for reassignment was merely a request for new supervisors and was therefore presumptively unreasonable, or that her request for reassignment hinged on a determination of what kind of supervisor might be a good fit for Herrmann. The City further argues that Herrmann failed to engage in the interactive process by not providing recordings of her interactions with her supervisors or otherwise explaining why her present supervisors were not a good "supervisory fit."

We disagree with this narrowed focus of Herrmann's request for reassignment. Viewing the facts in the light most favorable to Herrmann, the request for different supervisors is separate from the request for reassignment: Herrmann requested reassignment and additionally expressed a preference for reassignment to a job with different supervisors. To construe Klein's accommodation request as only one for new supervisors would ignore the rest of the record and require an inference in favor of the City. It would also penalize Herrmann for requesting more than the bare minimum that the ADA allows. With that in mind, we need not delve into the back and forth over the tape recordings or determine whether Herrmann failed to engage in

---

[1] Contrary to the City's claims, Aple. Br. at 22, Herrmann explicitly argued this point at the summary judgment hearing. JA at 972–73. This was her first opportunity to raise this point because the City did not argue that Herrmann failed to trigger the City's duty to consider reassignment until its reply. *See id.* at 852 n.6, 856.

the interactive process.[2] The recordings were irrelevant to Herrmann's overarching request for reassignment.

In sum, Herrmann presented some evidence supporting a conclusion that she could not be accommodated within her existing position. Therefore, the district court erred in holding that Herrmann did not meet her prima facie case. As the district court did not address the other elements of Herrmann's prima facie case the City challenges, we reverse and remand to provide the district court with that opportunity.

**2**

We next address whether Herrmann's request for leave was plausibly reasonable. As recognized by the district court, Herrmann and her medical providers made four relevant requests for leave:

(1) Dr. Foster's request on October 6, 2014 that Herrmann's FMLA leave be extended to November 30, 2014. JA at 695–96.

(2) Klein's request in his ADA paperwork filed on October 7, 2014 for Herrmann to take "enough time off" for her PTSD to subside, *id.* at 373–75, and his follow-up clarification that Herrmann's FMLA leave be extended to November 30, 2014, *id.* at 697.

(3) Herrmann's email to Preece on November 11, 2014 "requesting an accommodation under my [ADA]" to postpone the separation of employment to allow her more time to review the Notice of Intent to Separate Employment. *Id.* at 431.

---

[2] Similarly, the City contends on appeal that Herrmann did not meet the fourth element of her prima facie case because she did not know who the supervisors were for the only available requested position. *See* Aple. Br. at 29–30. It also challenges Herrmann's assertion that she satisfied the third element because she did not "reasonably request[] reassignment to a vacant position." *Id.* at 25 (quoting *Smith*, 180 F.3d at 1179). As the district court only addressed the second element of Herrmann's prima facie case, we leave consideration of these arguments to the district court on remand.

14

(4) Herrmann's email to Green on November 12, 2014 "requesting that additional time be provided for leave absence as an accommodation for [her] disabilities." *Id.* at 381.

"It is well-settled that a request for leave may lead to a 'reasonable' accommodation—such a request may allow an employee sufficient time to recover from an injury or illness such that the employee can perform the essential functions of the job (i.e., attend work) in the future." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). But a request for indefinite leave is not reasonable as a matter of law. *Id.* For a leave request to be reasonable, an employee must "provide an *expected duration of the impairment* (not the duration of the leave request)." *Id.* at 1130 (emphasis in original). This is because a reasonable accommodation "refers to those accommodations which presently, or in the *near future*, enable the employee to perform the essential functions of his job." *Id.* at 1129 (emphasis in original). And "[w]ithout an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job *in the near future* . . . ." *Id.* (emphasis in original).

The City takes a strict view of this standard: because Herrmann's medical providers requested leave through November 30 without providing a definite end-date of her impairment, Herrmann only provided evidence of the duration of her leave request, not the duration of her impairment. But we do not construe the duration requirement so narrowly, and certainly would not do so in chronic

15

impairment cases like this one. *See Aubrey v. Koppes*, 975 F.3d 995, 1011 (10th Cir. 2020). Herrmann provided evidence of the expected duration of her impairment in August 2014, when Klein estimated that the probable duration of Herrmann's condition was three to six months. Klein further indicated that with weekly treatments for eight weeks it was "[his] hope that Ms. Herrmann will be able to return to work at some point . . . after treatment." *Id.* at 362. While these statements were made in conjunction with requests for FMLA leave, and not requests for ADA accommodations, Klein later referred to "enough time off" so that Herrmann's PTSD symptoms could subside before returning to work. *Id.* at 375. Taken together, these statements informed the City of the expected end-date of Herrmann's current bout of PTSD symptoms and the date she would likely be able to return to work.

Statements made by medical providers in the months leading up to a request for leave are relevant in determining whether a request was reasonable. *See Aubrey*, 975 F.3d at 1011. In *Aubrey*, as here, the plaintiff had a chronic condition and provided an estimated date of return to work that was tied to an expected recovery timeline. *Id.* Moreover, this case is distinguishable from the cases the City relies upon. In *Cisneros*, we concluded that an employee's request for a finite amount of leave was not reasonable where the duration of the employee's illness was both "uncertain" and "unknown." 226 F.3d at 1130. In *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996), the plaintiff did not provide an end date for her impairment and her doctor's notes indicated her prognosis was uncertain. And in *Punt*, the plaintiff "was very vague about how much time

16

she . . . was going to miss." 862 F.3d at 1051. Instead, this case is more like *Rascon v. US West Communications, Inc.*, 143 F.3d 1324, 1334 (10th Cir. 1998), *overruling on other grounds recognized by Aubrey*, 975 F.3d 995, where we determined that an employee's request for time to attend a four-month treatment program for his disability was reasonable because "the prognosis from [his] doctors was good" and "the program was very likely to improve [his] work and home life by assisting him to cope with his [PTSD]."

In chronic impairment cases, ongoing exchanges between employers and employees are likely to start with discussion of FMLA leave and morph into discussion of ADA accommodations. It is also likely that an estimate of when symptoms will subside and allow return to work is the best an employee or medical provider can offer, given that chronic conditions can last a lifetime. Moreover, an employee on leave due to a chronic condition may have limited ability to respond to an employer, and an employer will have to consider multiple communications from the employee and the employee's medical providers together when determining whether a request for leave is unreasonable or indefinite.

Here, Herrmann provided an expected end date for her leave request and indicated that the proposed return date was tied directly to her recovery. Viewing the facts in the light most favorable to Herrmann, she provided an expected end date of her impairment. Nothing about Herrmann's condition or expected recovery timeline changed in the interim. The request for leave was therefore not indefinite and, for

17

summary judgment purposes, was plausibly reasonable. The district court erred in determining otherwise.

## B

The district court did not err in granting summary judgment on Herrmann's disability discrimination claim.

To survive summary judgment, Herrmann must raise a genuine dispute of fact on each element of her prima facie case. *See Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015). Specifically, she must show an issue of fact that "(1) [s]he was a disabled person as defined by the [ADA]; (2) [s]he was qualified, with or without reasonable accommodation, to perform the essential functions of h[er] job; and (3) [s]he was fired because of h[er] disability." *Id.* (quoting *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011)). The City does not challenge that Herrmann was disabled or qualified.

To show that she was fired because of her disability, Herrmann must "present some affirmative evidence that disability was a determining factor in the employer's decision." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). Therefore, Herrmann "must prove that the [City] acted with a discriminatory animus against her because she had a disability" when it terminated her employment. *Aubrey*, 975 F.3d at 1014. A plaintiff may prove discriminatory animus through either direct or circumstantial evidence, the latter of which is analyzed under the *McDonnell Douglas* burden-shifting framework. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 995 (10th Cir. 2019).

18

Before the district court, Herrmann staked her entire claim on direct evidence and expressly disavowed the *McDonnell Douglas* framework as inapposite. *See* JA at 515. The district court rejected her direct evidence argument. Now, she renews that argument and also attempts to argue that circumstantial evidence supports her claim. Herrmann suggests that we can consider circumstantial evidence because the district court addressed the circumstantial evidence issue. We cannot pursue that approach because the district court never applied "the relevant law to the relevant facts." *Tesone*, 942 F.3d at 992. The district court's only mention of circumstantial evidence was in its conclusion that "Herrmann offers no valid direct or circumstantial evidence of discrimination." JA at 944. These few words merely indicate the obvious: that Herrmann did not offer circumstantial evidence of discriminatory animus.[3] We therefore consider only Herrmann's direct evidence arguments.

Direct evidence of discriminatory animus is rare. If believed, direct evidence "prove[s] the existence of a fact in issue without inference or presumption," such as an employer's facially discriminatory policy or an oral or written statement showing a discriminatory motive. *Tesone*, 942 F.3d at 995. Herrmann contends that the Notice she received amounts to direct evidence of disability discrimination. Aplt. Br. at 46–48. The Notice says that Herrmann's "inability to return to work is involuntary for

---

[3] Even if Herrmann were correct that the district court addressed this issue, she now ignores her burden of establishing an inference of discriminatory animus, only arguing the City's proffered nondiscriminatory reason for her firing was pretextual. She cannot gain the benefit of an inference of discrimination without first establishing that inference. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008).

medical reasons," and Herrmann points to this language as direct evidence that she was terminated because of her disability. JA at 428. But the Notice is benign. It simply states that Herrmann was separated from her employment because she exhausted her FMLA leave and was unavailable to return to work. Nothing in the Notice demonstrates how Herrmann's PTSD resulted in her being treated differently from other employees who exhausted available leave. In context, it is clear that this reference was not direct evidence of discriminatory animus, instead it advised Herrmann of an avenue to accommodation: "Since your inability to return to work is involuntary for medical reasons, this memorandum is notice of a proposed action which may affect your employment and gives you an opportunity to present alternatives." JA at 428.

This situation is unlike those presented in the cases that Herrmann cites where a plaintiff's disability was the sole reason expressed for the termination. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996) ("The defendant's explanation for the decision to replace Monette was that Monette was on medical leave, unable to perform the job under any circumstances, and that, because only one customer service representative was employed in the building, the need to replace Monette was urgent."); *Lovell v. Champion Car Wash, LLC*, 969 F. Supp. 2d 945, 951 (M.D. Tenn. 2013) (finding direct evidence of discrimination where letter stated employee was "terminated for medical reasons, and that his medical reasons cannot be accommodated"). The one case Herrmann cites that supports her position, *White v.*

*Nucor Corp.*, 148 F. Supp. 3d 1316 (D. Utah 2015), fails to cite precedent from this circuit and does not provide extensive analysis.

In short, the Notice is not direct evidence that the City terminated Herrmann's employment because of her PTSD. Without more, Herrmann fails to show direct evidence of discriminatory animus.

C

The district court did not err in granting summary judgment on Herrmann's retaliation claim.

Herrmann does not offer direct evidence of retaliation. Instead, she claims to offer circumstantial evidence. Accordingly, the *McDonnell Douglas* framework applies to her retaliation claim. *See Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016). First, Herrmann must present a prima facie case of retaliation by demonstrating that she (1) engaged in protected activity; (2) suffered a material adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *See id.* at 1186–87. The burden then shifts to the City to present a legitimate, nondiscriminatory reason for the adverse action. *See id.* at 1186. The burden finally shifts back to Herrmann to show the City's nondiscriminatory reason is pretext. *See id.*

The parties do not dispute the first two elements of Herrmann's prima facie case. And given that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation," *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), the district court assumed (as do we) that

21

Herrmann met her prima facie case since she engaged in protected activity within six weeks of her termination on November 14, 2014—specifically, her October 7, 2014 request for reassignment and time off, and her November 12, 2014 request for time off. *See* JA at 949. Nevertheless, the district court held that Herrmann failed to show that the City's legitimate, non-retaliatory rationale for terminating Herrmann's employment was pretextual. We agree.

"[A] plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Foster*, 830 F.3d at 1194 (quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007)). "In establishing pretext, an employee can show the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Id.* (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007)).

The City's legitimate, non-retaliatory reason for ending Herrmann's employment was that she exhausted all available medical leave and did not provide a medical release to return to work by November 13, 2014, the day her leave expired. Herrmann offers two arguments that this rationale was pretextual. Neither are persuasive.

First, she contends that the City did not need her immediate return to work because it would take six to eight weeks to fill her position. Aplt. Br. at 54. But this says nothing about whether the City actually terminated Herrmann's employment in retaliation for her requests for accommodation. *See Aubrey*, 975 F.3d at 1016.

22

Second, Herrmann claims that the City's refusal to allow her to return to work is evidence of pretext. But when the City terminated her employment, Herrmann had not provided a medical release to return to work. Therefore, at the time of the decision, the City had no idea whether Herrmann could return to work. The City's refusal to allow her to return to work when she came to work the Monday after her termination may have been unfair or an example of "poor business judgment," but such circumstances are "not sufficient to show that the employer's explanation is unworthy of credibility." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 948 (10th Cir. 2011)). In short, nothing in the record suggests that the City acted with a retaliatory animus when it terminated Herrmann's employment.

### III

For the forgoing reasons, the district court's grant of summary judgment to the City on Herrmann's failure to accommodate claim is REVERSED and REMANDED for further proceedings, and its grant of summary judgment to the City on Herrmann's claims for disability discrimination and retaliation is AFFIRMED.