**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**October 1, 2024**

_____

**Christopher M. Wolpert**
**Clerk of Court**

DANIEL HERRICK,

    Plaintiff - Appellant,

v.

THE VAIL CORPORATION,

    Defendant - Appellee.

No. 23-1370
(D.C. No. 1:22-CV-00266-MEH)
(D. Colo.)

_____

## ORDER AND JUDGMENT[*]
_____

Before **TYMKOVICH**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

Daniel Herrick worked as a seasonal employee for the Vail Corporation (Vail) from 2018 until his employment was terminated in 2021. Afterwards, he brought this pro se action under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12217, claiming Vail failed to accommodate his disability, wrongfully discharged him, and then retaliated. The district court granted summary judgment to Vail, and Herrick appealed. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I

*A.  Factual History*

Herrick worked for Vail as a ticket seller.  He had three managers:  Cam Eiseman, Jackie Capriotti, and Quinton Neinaber.  His ultimate supervisor was Karen Reeder Pottraz.  The year he was hired and annually thereafter, Herrick completed a Voluntary Self-Identification of Disability form that asked whether he was disabled; each year, he checked a box on the form, stating: "No, I don't have a disability." R. at 97, 99, 101 (capitalization modified).  Although Herrick once told Eiseman he felt depressed during the Covid pandemic, he never told any manager or supervisor he was disabled.

An essential part of Herrick's job as a ticket seller required that he communicate with coworkers and guests in a professional and courteous manner. Vail's protocol for dealing with difficult guests required that he listen to the guest, de-escalate the situation, and try to resolve the problem.  If he was unable to solve the problem, he was required to call a supervisor.  Notwithstanding this protocol, Herrick was repeatedly reprimanded for exhibiting unprofessional behavior and engaging in disrespectful and combative communications with guests and coworkers.

In particular, Herrick was disciplined and coached by Reeder Pottraz after he was involved in a confrontation with another employee when a parking boot was installed on his car.  He also was disciplined when he "[got] into a tiff" with a co-worker, R. at 78, that escalated into a "full yelling match," R. at 219.

2

Then on March 10, 2021, Herrick encountered a disgruntled guest who yelled and cursed at him. Rather than adhere to the training protocol, Herrick raised his voice and yelled profanities back at the guest. The guest left, Herrick followed, and instead of calling a supervisor, he called security to discipline the guest. Capriotti arrived and sent Herrick into a nearby office to separate him from the guest, but Herrick refused. Capriotti repeated her directive, and Herrick complied, but when she spoke with him after the incident, he "began yelling and verbally attacking" her, even with Reeder Pottraz present. R. at 215, ¶ 9. Reeder Pottraz told Herrick he should have found a manager and she had been in her office the entire time.

Later that night, Herrick emailed Reeder Pottraz his account of the incident and informed her that he could no longer work for Capriotti because he felt unsupported. He wrote: "perhaps I should [return next season] at a different office where I maybe have more trust from the supervisors." R. at 141.

Following the incident with the disgruntled guest, Reeder Pottraz emailed Vail's Department of Employee Relations for guidance on handling Herrick's conduct. She wrote that he had been coached or disciplined three times in eighteen months due to "emotional outbursts with employees," the disgruntled guest, and his manager. R. at 225. She explained that the latest incident with the disgruntled guest disrupted other employees and Herrick no longer wished to work with Capriotti.

Six days after the incident, on March 16, 2021, Vail terminated Herrick's employment, citing his repeated episodes of unprofessional behavior and his disrespectful, combative communications with guests and coworkers.

3

On April 2, 2021, Herrick began sending troubling and progressively threatening emails to Vail employees. He first complained to Vail's chief operating officer (COO) that his employment was terminated after the incident with the disgruntled guest. He then sent the COO another email on May 25, 2021, with the subject line, "What do I need to do to get your attention? Hang myself by the neck off the Lionshead gondola?" R. at 91 (internal quotation marks omitted); R. at 144. He demanded an explanation for why he was fired and asked, "What's better, righting a wrong or cutting a corpse down from your gondola?" R. at 145. He concluded by writing: "Address this now or suffer the consequences." *Id.*

That email prompted a sheriff to visit Herrick at his home, and although he denied that he was suicidal, he acknowledged at his deposition that he thought of suicide every morning and wept for his two best friends who had killed themselves. With the sheriff's help, Herrick contacted a Vail employee who provided him with mental health resources available through Vail's Employee Assistance Program (EAP). Herrick then sent an email to that same employee and the COO, writing: "I would say thank you for the professional help, but of course you didn't provide that until weeks after I needed it." R. at 92 (internal quotation marks omitted); R. at 149. He also wrote that he "battle[d] suicidal feelings every morning." *Id.* He sought lifetime ski passes for himself and his daughter, warning that if the employees objected to his request, they would "gamble with uncertainty." R. at 150. He added that Vail gave him an "experience to end a life" and concluded the email with: "Barely hanging on, Dan Herrick." *Id.* (internal quotation marks omitted).

4

Thereafter, Herrick sent another email to the same two employees with the subject line:  "EAP information—would you rather litigate a wrongful death suit?" R. at 93 (internal quotation marks omitted); R. at 146.  He wrote:  "If you continue in this pool of callousness that HR and [an employee] are swimming in, I promise I will exact revenge in the worst ways possible for Vail Resorts."  R. at 147.  He demanded that Vail admit wrongdoing "[o]r risk litigating a wrongful death suit, after cleaning up my corpse on [Vail's] property."  *Id.*

In yet another email, Herrick leveled personal attacks against the same two employees.  *See* R. at 153.  The police contacted him again, but he was undeterred. The very next day he emailed the two employees, writing:  "It occurred to me as I was talking to the police officers yesterday, I want to live to make your lives as hellish as you've made mine.  Lol!!!"  R. at 94 (internal quotation marks omitted); R. at 157.  He wrote that one employee could ignore his emails, but she could not avoid him in person.  He encouraged her to wear make-up to work "because if I see you cameras will be rolling and [you] will be asked all the tough questions you've been ignoring."  *Id.*  He continued:  "I can only hope as many guests are present as possible to witness when we do meet again . . . . it will no doubt add to my social media campaign."  *Id.*  He wrote that the other employee was "off the hook," but she should tell her coworkers to wear make-up because "[c]ameras will be rolling for them too."  *Id.*  Later that day, Herrick was escorted off of Vail's property.

At that point, Vail provided Herrick with written notice, delivered by the police, that effective immediately he was permanently banned from entering any

5

property owned, leased, or controlled by Vail or any of its affiliates. Vail also obtained temporary and permanent civil protection orders from a state court.

### B. Procedural History

Herrick initiated this action under the ADA, claiming Vail failed to accommodate his depression, wrongfully terminated his employment, and retaliated by permanently banning him from its properties. Vail moved for summary judgment, and after a full round of briefing, Herrick filed a sur-reply, attaching text messages and several unsworn declarations from family and friends. The district court allowed Vail to respond to the sur-reply, but then Herrick filed a second sur-reply with additional exhibits. When the district court took up the summary judgment motion, it excluded the declarations and text messages attached to the first sur-reply, struck the second sur-reply, and granted summary judgment to Vail on all three claims. Herrick appealed.

## II

"[W]e review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011) (internal quotation marks omitted). "A 'court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). We view the evidence in the light most favorable to the nonmoving party. *Id.* "However, if the nonmovant bears the burden of persuasion on

6

a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1180 (10th Cir. 2018) (internal quotation marks omitted).

We liberally construe Herrick's pro se materials, but we do not act as his advocate. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). Pro se parties must follow the same rules of procedure that govern all litigants. *See id.* This means we will not search the record to construct arguments on Herrick's behalf. *Id.* It is his obligation to present his "contentions and the reasons for them, with citations to the authorities and parts of the record on which [he] relies." *Id.* at 840-41 (internal quotation marks omitted).

## A. Preliminary Matters

Before addressing the merits, we first consider two preliminary matters: 1) the district court's exclusion of the unsworn declarations attached to Herrick's first sur-reply and 2) his argument that the district court was biased against him.[1]

### 1. Evidentiary Ruling

Herrick first contends the district court improperly excluded the unsworn declarations attached to his first sur-reply, in which friends and family attested to his

---

[1] Herrick also contends the district court's summary judgment ruling denied him the right of confrontation and a fair trial. He fails to explain, however, where he preserved this argument in the district court. The argument is unavailing in any event. Any trial right he may have had was "not violated by the proper entry of summary judgment, because such a ruling means that no triable issue exists to be submitted to a jury." *Shannon v. Graves*, 257 F.3d 1164, 1167 (10th Cir. 2001).

depression.  The district court refused to admit the declarations because they do not comply with 28 U.S.C. § 1746, which authorizes an unsworn declaration if it is dated and the declarant subscribed under penalty of perjury that the writing is "true and correct."  We perceive no abuse of discretion.  *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 854 (10th Cir. 1999) ("Like other evidentiary rulings, we review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion." (internal quotation marks omitted)).  The district court correctly observed that the declarations cite § 1746, but they do not state they are true and correct, nor are they dated and signed under penalty of perjury.  *See Orr v. City of Albuquerque*, 531 F.3d 1210, 1216 n.3 (10th Cir. 2008) (finding no abuse of discretion in excluding unsworn statements that failed to comply with § 1746).  Although Herrick contends the district court should have allowed the declarations because he is pro se, his pro se status does not except him from following the same rules of procedure that govern all other litigants.  *See Garrett*, 425 F.3d at 840.

## 2.  Judicial Bias

Herrick next contends the district judge was biased because he (1) asked Vail's counsel if they would move for summary judgment, (2) described the disgruntled guest as something other than "abusive," Aplt. Opening Br. at 9, (3) bullied Herrick to not call a witness, and (4) held a season pass at Vail's resorts.  But there is no indication Herrick moved to disqualify the district judge as biased, so he has waived this argument.  *See Koch v. Koch Indus.*, 203 F.3d 1202, 1238-39 (10th Cir. 2000).

8

*B. Merits*

Turning to the merits, Herrick offers various arguments that are not tethered to any particular claim.  We liberally construe his pro se brief and consider his arguments as they relate to his claims that Vail 1) failed to accommodate his disability, 2) wrongfully terminated his employment, and 3) retaliated.

*1. Failure to Accommodate*

"To establish a prima facie failure-to-accommodate claim, [Herrick] had to show:  (1) he was disabled; (2) he was otherwise qualified; (3) he requested a plausibly reasonable accommodation; and (4) Defendant refused to accommodate his disability." *Dansie v. Union Pac. R.R. Co.*, 42 F.4th 1184, 1192 (10th Cir. 2022).

The district court determined Herrick failed to establish the first three elements of his prima facie case.  We need only consider the first element—whether Herrick was disabled.  *See Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017) (declining to reach remaining elements where plaintiff failed to show a fact issue on one element).  Herrick insists he is disabled because he has depression.  Given the record, we do not question whether he struggles with depression.  But, as the district court explained, for an impairment to be disabling under the ADA, there must be evidence that it "substantially limits at least one major life activity," *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003); *see* 42 U.S.C. § 12102(1) (defining "disability" as "a physical or mental impairment that substantially limits one or more major life activities").  Herrick does not address this requirement or cite any evidence indicating his depression substantially limits a

major life activity.  *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010) ("A medical diagnosis is insufficient, rather, the ADA requires plaintiffs to offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." (internal quotation marks omitted)).  Instead, he concedes he did not obtain medical records indicating he suffered from depression until after the district court entered judgment.  *See* Aplt. Opening Br. at 5, 11.  Although he attached those records to his opening brief, we cannot consider them because they were not before the district court.  *See Verlo v. Martinez*, 820 F.3d 1113, 1125-26 (10th Cir. 2016) (recognizing our review is limited to the evidence that was before the district court).

The only other evidence Herrick cites to show he was disabled is the deposition testimony of his manager, Cam Eiseman, who remembered Herrick "making an offhand comment about depression" during the pandemic.  R. at 130.  Eiseman did not interpret Herrick's comment as officially reporting a disability, however, because, as Eiseman explained, "It was a really tough time of year.  Everyone was depressed.  Everyone wasn't feeling great. . . . "  R. at 131.  This testimony fails to establish that Herrick's depression was disabling because it does not indicate whether it limited a major life activity as required to qualify as a "disability."  And Herrick consistently reported on his Voluntary Self-Identification of Disability form, "No, I don't have a disability."  R. at 97, 99, 101 (capitalization modified).  Given this evidence, Herrick fails to show a genuine factual dispute over whether he was disabled.

10

### 2. Wrongful Discharge

To establish a prima facie case on his wrongful-discharge claim, Herrick had to show: "(1) [he] was a disabled person as defined by the ADA; (2) [he] was qualified, with or without reasonable accommodation, to perform the essential functions of [his] job; and (3) [he] was fired because of [his] disability." *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 678 (10th Cir. 2021) (brackets and internal quotation marks omitted). As we explained in the previous section, Herrick failed to show he was disabled within the meaning of the ADA. Summary judgment was therefore proper on his wrongful-discharge claim.

### 3. Retaliation

Last, Herrick contends that after his employment was terminated, he sent "perfectly legal" emails to Vail employees, and Vail retaliated by banning him from its properties and obtaining the civil protection order. Aplt. Opening Br. at 13. A prima facie case of retaliation requires that Herrick demonstrate he "(1) engaged in protected activity; (2) suffered a material adverse action; and (3) a causal connection exists between the protected activity and the adverse action." *Herrmann*, 21 F.4th at 679. He may establish a causal connection with "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (internal quotation marks omitted).

Herrick cites no authority supporting his premise that his threatening, post-termination emails constitute protected activity. Further, his retaliation claim

11

presupposes that Vail's actions in banning him from its properties and obtaining a civil protection order were adverse employment actions. But generally, "only acts that constitute a significant change in *employment status*, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *C.R. Eng., Inc.*, 644 F.3d at 1040 (emphasis added) (brackets and internal quotation marks omitted). Conduct "that causes harm to future employment prospects, such as a negative job reference, [also] can be considered an adverse employment action," *id.*, but neither the prohibition on Herrick entering Vail property nor the civil protection order falls into this class of conduct. Rather, the adverse employment action was the termination of Herrick's employment. On that score, the district court explained that Herrick was required to show "he was 'subjected to an adverse employment action *subsequent to or contemporaneous with* the protected activity.'" R. at 679 (quoting *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1187 (10th Cir. 2016)). Temporal proximity between the protected activity and the adverse employment action is important because "[a] retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). Here, however, Herrick's employment was terminated *before* he sent the threatening emails, so even if they could be considered protected activity, there is no evidence of causation.

12

III.

Accordingly, the district court's judgment is affirmed.

Entered for the Court


Carolyn B. McHugh
Circuit Judge